[relates to Docket Item #s 7 & 8]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
―――――――――――――――――――――
                            :
JOHN J. ADAMSON, JR.,       :      HON. JEROME B. SIMANDLE
                            :
               Plaintiff,   :      Civil No. 08-4819 (JBS/JS)
                            :
     v.                     :
                            :              OPINION
FOULKE MANAGEMENT CORPORATION, :
et al.,                     :
                            :
               Defendants.  :
                            :
―――――――――――――――――――――
```

APPEARANCES:

John J. Jacko, III, Esq.
FELLHEIMER & EICHEN, LLP
1800 John F. Kennedy Boulevard
Suite 1400
Philadelphia, PA 19103
     Counsel for Plaintiff John J. Adamson

Laura D. Ruccolo, Esq.
CAPEHART & SCATCHARD, PA
8000 Midatlantic Drive
Suite 300
Mt. Laurel, NJ 08054
     Counsel for Defendants Foulke Management Corporation and
     Triad Financial Corporation

Bruce E. Barrett, Esq.
MARGOLIS EDELSTEIN, ESQS.
100 Century Parkway
Suite 200
Mount Laurel, NJ 08054
     Counsel for Defendant DaimlerChrysler Financial Services
     Americas LLC

**SIMANDLE,** District Judge:

## I.   **INTRODUCTION**

This matter is before the Court on motions to dismiss submitted by Defendants Foulke Management Corporation and Triad Financial Corporation [Docket Items 7 and 8].[1]  The pivotal issue presented is whether Plaintiff John Adamson ("Plaintiff"), a deaf man, entered into a legally binding and enforceable arbitration agreement with both Defendants Foulke Management Corporation ("Defendant Foulk") and Triad Financial Corporation ("Defendant Triad") surrounding his purchase of a motor vehicle through an automotive dealership, such that his claims against them must be dismissed.  Also before the Court is Defendants' motion to dismiss based on a release that Plaintiff allegedly signed giving up "any and all claims and rights" against Defendants.  Finally, Defendant Triad argues under Rule 12(b)(6) that even if the other two arguments do not succeed, Plaintiff's Complaint fails to state a claim against Triad.  The Court, as will be discussed, finds that there is a valid arbitration agreement, but will delay compelling arbitration to allow all parties to develop the record as to the costs of arbitration, specifically, whether the costs of arbitration to Plaintiff will be prohibitively expensive rendering the arbitration agreement ultimately unenforceable.

---

[1] The third defendant, DaimlerChrysler Financial Services ("Defendant DaimlerChrysler"), has not moved to dismiss.

## II.   BACKGROUND

### A.   Facts and Allegations

As alleged, Plaintiff Adamson presents a sympathetic scenario.   According to Plaintiff, Defendant Foulke, doing business as Cherry Hill Dodge car dealership, and Defendants Triad and DaimlerChrysler, principal businesses offering automobile financing through their agent Cherry Hill Dodge, took advantage of his disability, refused to provide him with a sign language interpreter, and engaged in various other misconduct while selling Plaintiff a used 2007 Dodge Caravan in exchange for his Buick.   This exchange left Plaintiff without the 2007 Dodge Caravan, but also without title to the Buick.   He admits, however, that during this process he signed two separate arbitration agreements at Cherry Hill Dodge, which purport to waive Plaintiff's right to a jury trial or any court action, and instead require that he (or Defendants) submit to arbitration at Defendants' (or his own) request.   The substance of agreements and the circumstances surrounding their signing are essential to the present motion.

The Complaint alleges the following.   On February 9, 2008, Plaintiff, along with his young son, who is also deaf, drove from their Philadelphia, Pennsylvania home to Cherry Hill Dodge in Cherry Hill, New Jersey in response to a television commercial in which Cherry Hill Dodge promised a credit of $8,000 for an

automobile trade-in and favorable credit terms "regardless of
credit history" for the purchase of a new 2008 Dodge Caravan.
(Compl. ¶¶ 16-18.)  At the dealership, Cherry Hill Dodge sales
representative Robert B. Hill ("Hill") met with Plaintiff and
refused his request for a sign language interpreter.  (Id. ¶¶ 20-
24.)  Hill ignored Plaintiff's explanation that he was deaf, that
he needed an interpreter in order to discuss and understand all
communications in their dealing, and that he could not "read
lips."  (Id. ¶¶ 20, 22, 24.)  Instead, Hill assured Plaintiff
than an interpreter was not needed, that they could communicate
in writing, and so, "We will be fine."  (Id. ¶¶ 21, 23.)
Plaintiff then expressed his interest in purchasing a new 2008
Dodge Caravan.  (Id. ¶ 26.)

     During the course of their exchange, Hill convinced
Plaintiff to purchase instead a used 2007 Dodge Caravan in
exchange for his Buick.  (Id. ¶¶ 27-40.)  Plaintiff alleges that
Hill and John Costas ("Costas"), Cherry Hill Dodge's financial
manager, intentionally misled him by quoting him a price well
above the Blue Book value of the van, by stating that Plaintiff's
credit application had been approved, by giving him only $1,000
credit for trading in his Buick, and by suggesting that New
Jersey law requires a higher interest rate for deaf people.
(Id. ¶¶ 30-36.)  Plaintiff again asked for a sign language
interpreter to better understand the terms of the transaction,

4

and Hill and Costas told him he could return home with the van and come back with an interpreter, but Plaintiff explained it was their obligation, not his, to provide an interpreter.  (Id. ¶ 36.)  He then proceeded to sign various documents to purchase and finance the used 2007 Dodge Caravan and signed over title to the Buick.  (Compl. ¶¶ 37-38; Compl. Ex. B.)

Amongst that paperwork were two arbitration agreements; one is part of a Retail Installment Contract ("RIC") and the other is a separate arbitration agreement.  (Compl. Ex. B.)  Both are dated February 9, 2008.  (Id.)  The RIC agreement contains this language in capital letters, right above the buyer's signature line:

> NOTICE TO RETAIL BUYER
> DO NOT SIGN THIS CONTRACT IN BLANK.   YOU ARE
> ENTITLED TO A COPY OF THE CONTRACT AT THE TIME YOU
> SIGN. KEEP IT TO PROTECT YOUR LEGAL RIGHTS.
> BUYER ACKNOWLEDGES RECEIPT OF A TRUE AND COMPLETELY
> FILLED IN COPY OF THIS RETAIL INSTALLMENT CONTRACT.
> IT IS IMPORTANT THAT YOU THOROUGHLY READ THE
> CONTRACT  BEFORE  YOU  SIGN  IT,  INCLUDING  THE
> IMPORTANT  ARBITRATION  DISCLOSURES  AND  PRIVACY
> POLICY ON THE BACK OF THIS CONTRACT.

(Id.)  On the back, in small print and in the bottom right corner at paragraph 21, are the "IMPORTANT ARBITRATION DISCLOSURES." (Id.)  They read, in most relevant part:

> **ARBITRATION: The following Arbitration provisions**
> **significantly affect your rights in any dispute**
> **with us.  Please read the following disclosures and**
> **the arbitration provision that follows carefully**
> **before you sign the contract.**
> 1.  If either you or we choose, any dispute
>      between  you  and  us  will  be  decided  by

5

arbitration.

2.  If such dispute is arbitrated, you and we will give up the right to a trial by a court or a jury trial.

3.  You agree to give up any right you may have to bring a class-action lawsuit or class arbitration, or to participate in either as claimant, and you agree to give up any right you may have to consolidate your arbitration with the arbitration of others.

4.  The information that can be obtained in discovery from each other or from third persons in arbitration is generally more limited than in a lawsuit.

5.  Other rights that you and/or we would have in court may not be available in arbitration.

Any claim or dispute, whether in contract, tort or otherwise (including any dispute over the interpretation, scope, or validity of this contract, arbitration section or the arbitrability of any issue), between you and us or any of our employees, parents, subsidiaries, affiliate companies, agents, successors or assignees, which arises out of or relates to a credit application, this contract, or any resulting transaction or relationship arising out of this contract shall, at the election of either you or us, or our employees, parents, subsidiaries, affiliate companies, agents, successors or assignees, be resolved by a neutral binding arbitration and not by a court action. Any claim or dispute is to be arbitrated on an individual basis and not as a class action.

(Id.)

The separate arbitration agreement, also in small (8.5 point) font, begins and ends, immediately before the signature line, with this language in capital, bold, letters: **"READ THIS ARBITRATION AGREEMENT CAREFULLY.  IT LIMITS CERTAIN OF YOUR RIGHTS, INCLUDING YOUR RIGHT TO MAINTAIN A COURT ACTION."**  (Id.) It goes on, in relevant part:

In consideration of the mutual promises made in this agreement, you and we agree that either you or we have an absolute right to demand that any dispute be submitted to an arbitrator in accordance with this agreement.  If either you or we file a lawsuit, counterclaim, or other action in a court, the other party has the absolute right to demand arbitration following the filing of such action.
ARBITRATION: Arbitration is a method of resolving disputes between parties without filing a lawsuit in court.  By signing this agreement, you and we are both agreeing that if there are any disputes between you and us, either you or we may require that such dispute be submitted to an arbitrator in accordance with this agreement.  If either party demands arbitration, the arbitrator's decision will be final and binding on you and us.  The arbitrator will provide any written reasons for the decision. You and we are giving up the right to continue a lawsuit, counterclaim, or other action in court, including the right to a jury trial, in the event the other party exercises the right to demand arbitration pursuant to this agreement.
DISPUTES COVERED: This agreement applies to all claims and disputes between you and us.  This includes, without limitation, all claims and disputes arising out of, in connection with, or relating to:

- your purchase of any goods or services from us;
- any previous purchase of goods or services from us;
- all documents relating to this or any previous purchase of goods or services from us;
- any service contract or other after market products purchased in connection with this or any previous purchase;
- whether the claim or dispute must be arbitrated;
- the validity of this arbitration agreement; any negotiations between you and us;
- any claim or dispute based on an allegation of fraud or misrepresentation, including fraud in the inducement of this or any other agreement;
- any claim or dispute based on a federal or state statute including, but not limited to

7

the N.J. Consumer Fraud Act, <u>N.J.S.A.</u> 56:8-1
<u>et seq.</u> and the Federal Truth in Lending Act;
- any claim or dispute based on an alleged tort; and
- any claim or dispute based on breach of contract.

This agreement also applies to any claim or dispute, including all the kinds of disputes listed above, between you and any of our employees or agents, any of our affiliate corporations, and any of their employees or agents and any third parties related to this transaction.

You agree that we do not have to initiate arbitration before exercising our remedy of repossession, if applicable, and you have no right to demand arbitration of a repossession, since we can resort to that remedy without going to court. Any claim or dispute arising out of, relating to, or in connection with our exercise of the remedy of repossession, however, is subject to arbitration in accordance with this agreement.

WAIVER OF RIGHT TO JURY TRIAL: You and we expressly waive all right to pursue any legal action to seek damages or any other remedies in a court of law including the right to a jury trial.

. . .

OTHER IMPORTANT AGREEMENTS:

. . .

5. If any term of this agreement is unenforceable, the remaining terms of this agreement are severable and enforceable to the fullest extent permitted by law.

6. This agreement supersedes any prior arbitration agreement that there may be between you and us.

. . .

9. If you have signed a Retail Installment Contract in connection with this transaction which contains a different arbitration agreement, then this arbitration agreement shall supersede that arbitration agreement and this arbitration agreement shall control any claims or disputes between you and us.

(<u>Id.</u>)

After signing the necessary paperwork and paying a deposit and various fees, Plaintiff left Cherry Hill Dodge with the 2007 Dodge Caravan. (Compl. ¶¶ 39-40.) Plaintiff made several more trips to Cherry Hill Dodge to receive paperwork, some of which purported to bear his signature but which Plaintiff alleges he did not sign, to sign forms, and to make his first loan payment. (Id. ¶¶ 41, 43, 50.) From February 9, 2008 through April, 2008, Plaintiff used the 2007 Dodge Caravan and purchased two new tires for the van. (Id. ¶¶ 48-49.) One day in early April, 2008, the Dodge disappeared from the street where Plaintiff had parked it. (Id. ¶ 52.) A week later, after Plaintiff had notified the police and his insurance carrier that the van was stolen, Costas called[2] to tell Plaintiff that the van had, in fact, been repossessed because Plaintiff's loan had not been approved. (Id. ¶ 54.) This was the first time Plaintiff learned of any problems with his loan application. (Id. ¶ 55.) Plaintiff, with Costas' encouragement that the problem could be fixed, made two more trips to Cherry Hill Dodge, the first time only to discover that Costas had left work for the day, and the second time to have Costas demand the keys to the 2007 Dodge. (Id. ¶¶ 56-59.) Though Plaintiff regained his old Buick, Defendants have not transferred title back to Plaintiff, nor have they provided any

---

[2] Plaintiff uses a form of video relay to communicate via the telephone. (Id. ¶ 54.)

documentation that Plaintiff is not the owner of the 2007 Dodge, so that he is currently paying insurance premiums for both vehicles.  (Id. ¶¶ 59-62.)  Defendants have not reimbursed Plaintiff for the tires he purchased or the damage to the Buick and Plaintiff has refused to return the purchase documents for the 2007 Dodge.  (Id. ¶¶ 63-65.)

**B.  Procedural History**

On September 26, 2008, Plaintiff brought the present action against Defendants.  Plaintiff presents the following claims against all Defendants: Count I alleges that Defendants violated the Americans with Disabilities Act ("ADA"); Count II alleges violations of the Equal Credit Opportunity Act ("ECOA"); Count III alleges violations of the New Jersey Law Against Discrimination ("NJLAD"); Count IV alleges violations of the New Jersey Loan Broker Act ("NJ Loan Broker Act"); Count V alleges violations of the New Jersey Consumer Fraud Act ("NJ Consumer Fraud Act"); Count VI alleges violations of the New Jersey Truth in Consumer Contract Act ("NJ Truth in Consumer Contract Act"); Count VII alleges the tort of conversion; Count VIII seeks declaratory judgment pursuant to N.J. Stat. Ann. §§ 2A:16-50 to -62; and Count IX seeks declaratory judgment pursuant to 28 U.S.C. §§ 2201-2202.  Plaintiff attached to his complaint multiple documents related to his attempted purchase of the 2007 Dodge Caravan, including the two arbitration agreements quoted at

length above.

Defendant DaimlerChrysler answered Plaintiff's complaint and brought cross-claims against the other defendants in this action, but has not yet filed a dispositive motion.[3]  Defendants Foulke and Triad filed the instant motions to dismiss, to which they attached a release of claims purportedly signed by Plaintiff. Defendants Foulke and Triad ask the Court to dismiss Plaintiff's claims against them because Plaintiff has released these claims, has agreed to their binding arbitration, or has failed to state a claim at least as to Defendant Triad.  Whatever the outcome on these motions, the claims against Defendant DaimlerChrysler would remain in this Court.

## III. DISCUSSION

Defendants Foulke and Triad ask the Court to enforce an arbitration agreement which Plaintiff admittedly signed and which Defendants argue binds him to arbitrate all the claims raised in this action.  Plaintiff objects, first maintaining that the two agreements he signed present conflicting, ambiguous terms and therefore he did not knowingly waive his right to try these claims in a court of law.  Even if the waiver was valid, Plaintiff argues that it is not enforceable, because the

---

[3] For the purposes of this opinion, this Court will occasionally refer to Defendants Foulke and Triad as "Defendants."  Defendant DaimlerChrysler, however, has not moved to dismiss and is not among "Defendants" in this opinion.

11

agreement itself is unconscionable.  The Court, for the reasons discussed below, finds that an arbitration agreement exists, but that the record is not sufficiently developed to determine whether the agreement is unconscionable.  Thus, the Court will give Plaintiff and Defendants Foulke and Triad a limited opportunity to develop the record on this narrow point.

Defendants move the Court to compel arbitration of all of Plaintiff's claims, pursuant to Section 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, and to dismiss this court action.  See Seus v. Nuveen & Co., Inc., 146 F.3d 175, 179 (3d Cir. 1998), overruled on other grounds by Green Tree Fin. Corp. Ala. v. Randolph, 531 U.S. 79 (2000).  When faced with a motion to compel arbitration, this Court's review is narrow.  John Hancock Mut. Life Ins. Co. v. Olick, 151 F.3d 132, 137 (3d Cir. 1998).  The Third Circuit has made clear district courts must "engage in a limited review to ensure that the dispute is arbitrable-i.e., that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement."  John Hancock, 151 F.3d at 137 (internal punctuation and citation omitted).

**A.   Does an Agreement Exist?**

Arbitration agreements are governed by the FAA, enacted by Congress "to over overcome judicial resistance to arbitration . . . and to declare a national policy favoring arbitration of claims

that parties contract to settle in that manner." <u>Vaden v.
Discover Bank</u>, 129 S. Ct. 1262, 2009 WL 578636, at *6 (Mar. 9,
2009) (internal punctuation and citations omitted).  In measuring
the force of these agreements, the Court must look to state
contract law to determine if a valid agreement to arbitrate
exists.  <u>First Options of Chicago, Inc. v. Kaplan</u>, 514 U.S. 938,
944 (1995); <u>Homa v. Am. Express Co.</u>, --- F.3d ---, 2009 WL
440912, at *3 (3d Cir. Feb. 24, 2009); <u>Blair v. Scott Specialty
Glass</u>, 283 F.3d 595, 603 (3d Cir. 2002).  New Jersey courts have
favored arbitration as a means of resolving disputes and are
guided by the national policy and State interest preferring
arbitration when interpreting those agreements.  <u>Delta Funding
Corp. v. Harris</u>, 912 A.2d 104, 110 (N.J. 2006); <u>Martindale v.
Sandvik, Inc.</u>, 800 A.2d 872, 877 (N.J. 2002).  Nevertheless, in
order for an arbitration agreement to be binding, and require
dismissal of any claims presented to the courts, it must be clear
that all parties have agreed that those issues may be arbitrated.
<u>Garfinkel v. Morga</u>, 773 A.2d 665, 670 (N.J. 2001).  The New Jersey
Supreme Court has explained:

> In respect of specific contractual language, "[a]
> clause depriving a citizen of access to the courts
> should clearly state its purpose.  The point is to
> assure that the parties know that in electing
> arbitration as the exclusive remedy, they are
> waiving their time-honored right to sue." [<u>Marchak
> v. Claridge Commons, Inc.</u>, 633 A.2d 531, 535 (N.J.
> 1993)].  As we have stressed in other contexts, a
> party's waiver of statutory rights "must be clearly
> and unmistakably established, and contractual

13

language alleged to constitute a waiver will not be read expansively." [<u>Red Bank Reg'l Educ. Ass'n v. Red Bank Reg'l High Sch. Bd. Of Educ.</u>, 393 A.2d 267, 276 (N.J. 1978)].

<u>Garfinkel</u>, 773 A.2d at 670.  Furthermore, as in any other contract case, "the party relying upon the allegedly valid contract has the burden of establishing its validity."  <u>See</u> <u>Doyle v. Northrop Corp.</u>, 455 F. Supp. 1318, 1329 (D.N.J. 1978).

There is no dispute that Plaintiff signed the RIC arbitration agreement and the separate arbitration agreement in question, nor has Plaintiff argued that his present claims cannot be the subject of an arbitration agreement.  Further, Plaintiff does not suggest that either arbitration agreement, taken alone, is not clearly broad enough to encompass all of his claims in this action.[4]  Instead, Plaintiff argues that the two arbitration

---

[4] Nor could he.  The RIC arbitration agreement states: "If either you or we choose, any dispute between you and us will be decided by arbitration."  (Compl. Ex. B.)  It goes on to state that the arbitration agreement includes "[a]ny claim or dispute, whether in contract, tort or otherwise . . . which arises out of or relates to a credit application, this contract, or any resulting transaction or relationship arising out of this contract."  (<u>Id.</u>)  This broad language provided Plaintiff with sufficient notice that all claims (statutory or otherwise) arising out of his attempt to purchase the 2007 Dodge and to obtain credit for that purchase.  <u>See</u> <u>Martindale</u>, 800 A.2d at 883-84 (holding that arbitration agreement that covered "all disputes" relating to employment or termination was broad enough to clearly include statutory claims); <u>Rockel v. Cherry Hill Dodge</u>, 847 A.2d 621 (N.J. Super. Ct. App. Div. 2004) (finding identical language to be sufficiently broad to encompass plaintiff's statutory claims under <u>Martindale</u>).  The separate arbitration agreement similarly states: "This agreement applies to all claims and disputes between you and us."  (Compl. Ex. B.)  It also expressly includes federal and state statutory claims,

agreements conflict and so there is no valid arbitration
agreement.  The Court will reject this argument for the reasons
to be discussed.

It is certainly true, as previously stated, that a waiver of
the right to sue must be clear and unmistakable.  This does not
mean, however, that an arbitration agreement (or agreements) must
be entirely unambiguous to be enforceable, especially where, as
here, some rights have been clearly waived.  See Delta, 912 A.2d
at 110.  In fact, where the ambiguous provisions do not speak to
Plaintiff's consent to waive his right to bring the present
claims to court, any ambiguities are left to be resolved by the
arbitrator.  Id. ("Under federal arbitration law, it is
ordinarily the role of an arbitrator and not the courts to
interpret ambiguous provisions of an arbitration agreement.").
It is for this reason that the New Jersey Supreme Court, when
considering whether to enforce an arbitration agreement, looks to
see whether a party clearly and unambiguously waived the
particular claim at issue.  See Leodori v. Cigna Corp., 814 A.2d
1098, 1104 (N.J. 2003) ("[T]o be enforceable under those
[contract law] principles in New Jersey, a waiver-of-rights
provision must reflect that an employee has agreed clearly and
unambiguously to arbitrate the disputed claim."); Martindale, 800
A.2d at 883-84 ("In the circumstances of this case, the language

---

including the New Jersey Consumer Fraud Act.  (Id.)

in the arbitration was not only clear and unambiguous, it was also sufficiently broad to encompass reasonably plaintiff's statutory causes of action."); Garfinkel, 773 A.2d at 672 ("We . . . conclude that paragraph eighteen of the parties' [arbitration] agreement is insufficient to constitute a waiver of plaintiff's remedies under the LAD."). For example, in Garfinkel, the court observed that while the arbitration agreement in question did expressly cover disputes related to elements of the employment contract itself, it was unclear whether plaintiff had waived her statutory rights, and as such those claims could not be forced into arbitration. 773 A.2d at 670-73. In this case, Plaintiff signed two separate arbitration agreements in which he clearly and unambiguously agreed to waive his right to bring the present claims before a court (and a jury). Whether other claims would also fall within the scope of these two agreements is of no matter to the present litigation.

In opposition to this position, Plaintiff cites Rockel v. Cherry Hill Dodge, 847 A.2d 621 (N.J. Super. Ct. App. Div. 2004), where the court declined to enforce two conflicting arbitration provisions. The Rockel court found that when the plaintiff signed two "separate and somewhat disparate arbitration clauses," the resultant ambiguity prevented compelling the arbitration of the plaintiff's claims. 847 A.2d at 624. The court did not consider whether either agreement included plaintiff's New Jersey

16

Consumer Fraud Act claims, but instead observed that the scope of the second arbitration clause was generally "far more expansive" than the first.  <u>Id.</u> at 625.  To the extent that the New Jersey Appellate Division found that whenever an party signs two arbitration clauses of different scope there can be no binding arbitration agreement as to any claims, the Court is not bound by this ruling and finds it unsupported by New Jersey jurisprudence.

The <u>Rockel</u> court did, however, look at the two arbitration provisions separately and concluded that neither conformed with <u>Garfinkel</u> and <u>Martindale</u>, for one was not broad enough to include the plaintiff's statutory fraud claim and the other was too hidden within a larger contract.[5]  <u>Rockel</u>, 847 A.2d at 626-27.  Thus, the appellate court concluded, "the presence of two conflicting arbitration provisions, the expression of a waiver of the right to trial by jury in small print, and the absence of any other clear warning or caution of the waiver of statutory rights, requires a rejection of defendant's attempt to compel arbitration of these claims."  <u>Id.</u> at 627-28.  In the present case, though the RIC arbitration agreement is by no means prominent, the separate arbitration agreement is a separate document, which

---

[5] One of the contracts at issue in <u>Rockel</u> is virtually identical to the RIC arbitration agreement here.  847 A.2d at 624.  Though the Appellate Division was not satisfied with the prominence of the arbitration and waiver provisions in the contract, the court did observe that the language of the agreement clearly encompassed the plaintiff's statutory claims under <u>Martindale</u>.  <u>Id.</u> at 626-27.

warns in bold and capital letters at both the beginning and the end of the agreement that the customer, by signing, is limiting his "right to maintain a court action," and expressly lists the disputes covered (including federal and state statutory claims). (Compl. Ex. B.)  Plaintiff cannot avoid arbitration where he signed two arbitration agreements, both of which cover the disputes in question here, and at least one of which was a prominent document, clearly marked and intended to draw his attention to the rights he had waived.  As a consequence, there exists a valid contract to arbitrate Plaintiff's claims in this action against Defendants Foulke and Triad.[6]

---

[6] Neither party raises what the Court sees as a discrepancy between the parties included in these two arbitration agreements -- perhaps because this difference (which implicates only Defendant Triad) ultimately has no impact on the outcome of this case.  Nevertheless, the Court will briefly address it.  The separate arbitration agreement expressly applies to "third parties related to this transaction," while the RIC arbitration agreement is limited to disputes with Cherry Hill Dodge and its "employees, parents, subsidiaries, affiliate companies, agents, successors or assignees."  (Compl. Ex. B.)  If, as Defendant Triad maintains, it is a "third party" and not a principal in this transaction, then it would not fall within the RIC arbitration agreement and the resulting ambiguity between the two arbitration agreements might be fatal to its motion to compel arbitration.  However, if Defendant Triad is not a principal (and is only a third party), then Plaintiff's claims against it fail, for the sole basis of all these claims is Plaintiff's allegation that Cherry Hill Dodge acted as Triad's agent and thus Triad should be held liable for the actions of the Dodge dealership. (Compl. ¶¶ 7, 43; Pl. Opp'n at 28-30.)  The Court will, on this motion to dismiss, accept as true Plaintiff's allegations of agency and find that claims against Defendant Triad also fall within the scope of these two arbitration agreements.  If the arbitrator finds that there is no true agency relationship, that would presumably resolve Plaintiff's claims against Triad.

**B.    Is Any Such Agreement Enforceable?**

Plaintiff presents an alternative argument challenging the enforcement of the arbitration agreements, by urging the Court to find them unconscionable.[7]  The Court finds Plaintiff has failed to meet his burden of establishing that the arbitration agreement itself is unconscionable solely because he signed the agreement without the benefit of a sign language interpreter.  However, the Court concludes further evidence is required to determine if arbitration would be prohibitively expensive such that it is unconscionable and unenforceable.

Though the FAA sought to remove arbitration from disfavored status by insisting that arbitration agreements be placed on the

---

[7] Plaintiff also very briefly suggests that the separate arbitration agreement wants for sufficient consideration, but there is no serious dispute that Plaintiff signed all the forms presented to him in exchange for receiving the 2007 Dodge Caravan.

With similar brevity, Plaintiff argues at the very end of his sur-reply, that Defendants have waived their right to compel arbitration, because of the order of their arguments in their motion to dismiss, citing a New Mexico Supreme Court case. Defendants sought to compel arbitration before answering Plaintiff's complaint and so this argument lacks merit.  See Spaeth v. Srinivan, 959 A.2d 290, 294 (N.J. Super. Ct. App. Div. 2008).

Finally, Plaintiff maintains that Defendant Triad's former counsel waived the right to file this motion to dismiss, because Plaintiff's counsel agreed to an extension of time to file only an Answer, and not a motion to dismiss.  The Court, having reviewed the submissions from both Plaintiff and Defendant Triad, finds that Defendant Triad did not waive its right to assert the present affirmative defenses and will consider its motion properly filed.

same footing as other contracts, they are similarly limited by state contract law, and in particular, the doctrine of unconscionability.  <u>Homa</u>, 2009 WL 440912, at *3-5 (citing <u>Doctor's Assocs., Inc. v. Casarotto</u>, 517 U.S. 681, 686-87 (1996)); <u>Muhammad v. County Bank of Rehoboth Beach</u>, 912 A.2d 88, 94 (N.J. 2006).  The first question posed by this doctrine is whether the arbitration agreement was a contract of adhesion, such that <u>Rudbart v. Northern New Jersey Dist. Water Supply Comm'n</u>, 605 A.2d 681 (N.J. 1992), applies.

> A contract of adhesion is defined as "[a] contract where one party . . . must accept or reject the contract [.]"   "[T]he essential nature of a contract of adhesion is that it is presented on a take-it-or-leave-it basis, commonly in a standardized printed form, without opportunity for the 'adhering' party to negotiate except perhaps on a few particulars."

<u>Gras v. Assocs. First Capital Corp.</u>, 786 A.2d 886, 889 (N.J. Super. Ct. App. Div. 2001) (quoting <u>Rudbart</u>, 605 A.2d at 685-86) (internal citations omitted).  There can be no real doubt that the arbitration agreements were contracts of adhesion -- namely, that they were a necessary part Plaintiff's contract to purchase the 2007 Dodge Caravan and, as Defendants point out, his other option was to "take his business elsewhere."[8]

---

[8] Defendants mistakenly argue that because Plaintiff was free to leave without the van, the arbitration agreement was not a contract of adhesion.  As outlined by <u>Gras</u> and <u>Rudbart</u>, a contract of adhesion is non-negotiable, except to the extent that the party is free to "leave it."  <u>Gras</u>, 786 A.2d at 889.  It is similarly immaterial that courts have enforced such contracts,

"The determination that a contract is one of adhesion, however, 'is the beginning, not the end, of the inquiry' into whether a contract, or any specific term therein, should be deemed unenforceable." <u>Muhammad</u>, 912 A.2d at 97.  In <u>Rudbart</u>, the New Jersey Supreme Court identified four factors that guide the Court in determining whether a contract of adhesion is unenforceable: (1) the subject matter of the contract, (2) the parties' relative bargaining positions, (3) the degree of economic compulsion motivating the "adhering" party, and (4) the public interests affected by the contract.  <u>Delta</u>, 912 A.2d at 111 (quoting <u>Rudbart</u>, 605 A.2d at 687).  These factors, the New Jersey courts have recognized, "focus on the procedural and substantive aspects of a contract of adhesion," but a mere inequality of bargaining powers between the parties is not enough to render a contract unconscionable.  <u>Id.</u> at 111.  As a consequence, only in the case of "overwhelming procedural unconscionability" will this aspect be sufficient to make a contract unenforceable.  <u>Muhammad</u>, 912 A.2d at 97 n.3.  Otherwise, the adhering party must point to something unconscionable in the substance of the arbitration agreement. <u>Delta</u>, 912 A.2d at 111; <u>Muhammad</u>, 912 A.2d at 97.

Despite this directive from the New Jersey courts, Plaintiff

---

because for the reasons discussed above, the mere fact that a
contract is one of adhesion does not automatically render it
unenforceable.  <u>Id.</u>

initially relied almost exclusively on the claimed procedural defects in his dealing with Cherry Hill Dodge.  As a deaf man deprived of a sign language interpreter, Plaintiff argues he did not have a meaningful opportunity to negotiate the terms of the contract.  Though if proven true, the allegations may lead to success on the merits of Plaintiff's claims, the Court finds they do not render the contract unconscionable.  There is no suggestion that Plaintiff cannot read or was in any way desperate to exchange his Buick for the used 2007 Dodge Caravan.  Though unfortunate, the facts do not present such overwhelming procedural unconscionability as to call the Court, without more, to invalidate the arbitration agreement.  See Delta, 912 A.2d at 108 n.1, 111 (practice of coming to home of seventy-eight-year-old woman with only a sixth-grade education at ten o'clock at night and having her sign an arbitration agreement included in a stack of mortgage documents did not, by itself, render the arbitration agreement unenforceable); see also Morales v. Sun Constructors, Inc., 541 F.3d 218 (3d Cir. 2008) (holding that former employee was bound by arbitration clause in employment agreement, even though he was ignorant of language in which agreement was written).

In his initial opposition, Plaintiff failed to point to any aspect of the arbitration agreement itself that is unconscionable.  In his sur-reply, however, he adds that the cost

of arbitration,[9] and in particular the cost of providing his own sign language interpreter,[10] would be prohibitively expensive. The law requires this Court to invalidate arbitration cost provisions if large arbitration costs would preclude a litigant from effectively pursuing his claims.  <u>Green Tree</u>, 531 U.S. at 90[11]; <u>Blair v. Scott Specialty Gases</u>, 283 F.3d 595, 605 (3d Cir.

---

[9] The separate arbitration agreement has only this to say about costs: "COST OF ARBITRATION: If you start arbitration, you agree to pay the initial filing fee and required deposit required by the American Arbitration Association ["AAA"].  If we start arbitration, we will pay the filing fee and required deposit." (Compl. Ex. B.)  Also relevant, is this provision in the agreement: "ARBITRATION RULES: Arbitration will be conducted under the 'Commercial Arbitration Rules' of the [AAA] that are in effect at the time arbitration is started and under the rules set forth in this agreement.  If there is any conflict between what the Commercial Arbitration Rules say and what this agreement says, what this agreement says will govern." (<u>Id.</u>)  As a consequence, both Plaintiff and Defendants cited to the AAA rules in speculating as to the necessary costs for arbitration.

[10] If the case remains in this Court, the Court must provide an interpreter for Plaintiff, as a deaf participant in a hearing or trial, free of charge.  <u>See</u> 1 The Guide to Judiciary Policies and Procedures, ch. 3, pt. H, which provides in relevant part:

> Each federal court is required to provide, at judiciary expense, sign language interpreters or other appropriate auxiliary aids and services to participants in federal court proceedings who are deaf, hearing-impaired, or have other communications disabilities.  The court shall give primary consideration to a participant's choice of auxiliary aid or service.

[11] Though <u>Green Tree</u> considered whether expenses could prevent a litigant from exercising her federal statutory rights, the Third Circuit has since applied this reasoning to claims based on both federal and state statutory claims, <u>Parilla v. IAP Worldwide Servs.</u>, 368 F.3d 269 (3d Cir. 2004), and to diversity actions with only state statutory and common law claims,

2002).

Plaintiff maintains these costs would be exorbitant because the separate arbitration agreement (the arbitration agreement that Defendant Foulke and Triad are seeking to enforce) requires the application of the Commercial Arbitration Rules of the American Arbitration Association ("AAA"), rather than the Consumer Rules.  Despite clear language to the contrary in the agreement, Defendants insist that the Consumer Rules would, in fact, be applied.  The Court sees no basis in the text of the agreement, see supra n.9, -- which is binding on Defendants as well as Plaintiff -- to support Defendants' suggestion and so the Commercial Rules will be used in judging whether the contract is enforceable.

To the extent Plaintiff has expressed concerns about costs, however, the record is not sufficiently developed as to this issue.  See Parilla v. IAP Worldwide Serv., 368 F.3d 269, 283-84 (3d Cir. 2004); Blair, 283 F.3d at 607-10.  "A party seeking to invalidate an arbitration agreement because arbitration would be prohibitively expensive bears the burden of showing this likelihood."  Spinetti v. Serv. Corp. Int'l, 324 F.3d 217 (3d Cir. 2003) (citing Green Tree, 531 U.S. at 92).  To meet this burden, a party must (1) "come forward with some evidence to show the projected fees that would apply to their specific

_____

Alexander v. Anthony Int'l, LP, 341 F.3d 256 (3d Cir. 2003).

24

arbitrations," <u>Blair</u>, 283 F.3d at 607, and (2) show the party's "inability to pay those costs," <u>Parilla</u>, 368 F.3d at 284.

At present, there is no evidence in the record on either prong, and instead the Court is left with Plaintiff's counsel's representations in his sur-reply as to costs and nothing as to Plaintiff's financial situation.  The Third Circuit, however, requires that Plaintiff be given an opportunity for limited discovery on these issues, so that the Court might develop a record on which to base any determination as to the validity of the arbitration agreement.  <u>Blair</u>, 283 F.3d at 610; <u>see</u> <u>Parilla</u>, 368 F.3d at 284.  The Court will consequently enter an Order providing Plaintiff and Defendants Foulke and Triad forty-five days to conduct limited discovery on the sole issue of the costs of arbitration and Plaintiff's inability to pay those costs, as compared to the costs of litigation before this Court.[12]

## IV. CONCLUSION

For the foregoing reasons, the Court finds that there is a valid arbitration agreement governing all of Plaintiff's present claims, but that the record is not sufficient to judge whether

---

[12] Having found that there is a valid arbitration agreement and that arbitration may ultimately be compelled unless Plaintiff demonstrates that the costs of arbitration will be prohibitively expensive, the Court will leave Defendants' remaining arguments regarding the merits of Plaintiff's claims for future determination.  If this Court ultimately determines that it retains jurisdiction over Plaintiff's claims against Foulke and Triad, the Court will address those arguments at that time.

the agreement is unconscionable.  The Court will thus provide

Plaintiff, and Defendants Foulke and Triad, with an opportunity

to develop the record on that single issue.

    The accompanying Order will be entered.


**April 6, 2009**                    **  s/ Jerome B. Simandle    **
Date                                 JEROME B. SIMANDLE
                                     United States District Judge