IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JOHN J. ADAMSON, JR., | : | HON. JEROME B. SIMANDLE |
| Plaintiff, | : | Civil No. 08-4819 (JBS/KMW) |
| v. | : | |
| FOULKE MANAGEMENT CORPORATION, et al., | : | **OPINION** |
| Defendants. | : | |

APPEARANCES:

John J. Jacko, III, Esq.
FELLHEIMER & EICHEN, LLP
1800 John F. Kennedy Boulevard
Suite 1400
Philadelphia, PA 19103
        Counsel for Plaintiff John J. Adamson

Laura D. Ruccolo, Esq.
CAPEHART & SCATCHARD, PA
8000 Midatlantic Drive
Suite 300
Mt. Laurel, NJ 08054
        Counsel for Defendants Foulke Management Corporation and
        Triad Financial Corporation

Bruce E. Barrett, Esq.
MARGOLIS EDELSTEIN, ESQS.
100 Century Parkway
Suite 200
Mount Laurel, NJ 08054
        Counsel for Defendant DaimlerChrysler Financial Services
        Americas LLC

**SIMANDLE**, District Judge:

This matter is before the Court on Plaintiff John Adamson's motion to find the arbitration agreement he signed with Defendants to be unconscionable and unenforceable[1] [Docket Item 37], and a motion to dismiss and compel arbitration submitted by Defendants Foulke Management Corporation and Triad Financial Corporation (collectively, "Defendants")[2] [Docket Item 7], which the Court decided only in part on April 6, 2009, <u>Adamson v. Foulke Mgmt. Corp.</u>, No. 08-4819, 2009 WL 961378 (D.N.J. Apr. 6, 2009).

In his moving papers, Plaintiff attacks two aspects of the agreement: (1) the costs of arbitration, including filing fees, interpreter, and arbitrator; and (2) the requirement that he pay all reasonable attorney's fees and costs that Defendants incurred

---

[1] Plaintiff also moves the Court to deem Plaintiff's requests for admissions as admitted because Defendants in their answers continued to insist that the arbitration agreement would be governed by the AAA Consumer Rules, despite this Court's opinion suggesting that the AAA Commercial Rules apply under the terms of the agreement. Because, as the Court will explain below, the Consumer Rules are in fact a part of the Commercial Rules, Defendants refusal to admit that the Commercial Rule fees would apply is not an unfair response to Plaintiff's requests under Rule 36. Plaintiff does not appear to press the matter in his reply and so the Court will deny this aspect of Plaintiff's motion.

[2] Defendant DaimlerChrysler Financial Services Americas LLC has not sought to enforce any arbitration agreement and is not a party to this motion practice. Thus, when the Court refers to "Defendants" in this motion, the Court is referring only to Foulke Management and Triad.

in seeking dismissal of this lawsuit.  Towards the end of his moving papers Plaintiff also suggests that the arbitration agreement is unconscionable, regardless of his ability to pay, because under the agreement he loses access to a free sign language interpreter, as would be provided in federal court.  On October 2, 2009, during a telephone conference to discuss the possible resolution of this dispute regarding arbitration, Plaintiff's counsel argued for the first time that the provision requiring application of New Jersey law is unconscionable. Finally, at an evidentiary hearing held on November 10, 2009, Plaintiff's counsel suggested that American Arbitration Association provides a hostile forum for arbitration, because it requires Plaintiff to pay the costs of his own interpreter.[3] Defendants maintain that the arbitration agreement is enforceable and that even if some provisions are unconscionable, the Court must sever those provisions and compel arbitration.

For the reasons discussed below, the Court finds that Plaintiff has failed to meet his burden of providing credible, reliable evidence to show that arbitration would be prohibitively expensive.  The Court will deny Plaintiff's motion attacking the

---

[3] Plaintiff in his moving papers made only an oblique reference to such a claim, noting the "irony" of requiring Plaintiff to arbitrate in a forum where he allegedly will be required to pay for the costs of his own interpreter, when his claim is based in part on Defendants' obligation to provide an interpreter.  (Pl. Opening Brief at 9.)

arbitration agreement as unenforceable based on financial hardship, and will grant the moving Defendants' motion to dismiss the Complaint against them and to compel arbitration. Plaintiff's suggestion that any arbitration agreement requiring a deaf person to pay the costs of his own American Sign Language interpreter is violative of anti-discrimination laws is preserved for future adjudication if necessary, but such a claim is presently undeveloped on the record and is premature.

## I.   BACKGROUND

### A.   Procedural History

This action arises out of Plaintiff's attempt to purchase a vehicle from Defendant Foulke Management Corporation ("Defendant Foulk"), and to obtain financing for the vehicle through Triad Financial Corporation ("Defendant Triad") and DaimlerChrysler Financial Services ("Defendant DaimlerChrysler").  Plaintiff seeks relief under various federal and state anti-discrimination and consumer fraud statutes for alleged discriminatory and fraudulent conduct by Defendants against Plaintiff during the purchasing and financing process, including their alleged refusal to procure an American Sign Language ("ASL") interpreter to assist Plaintiff while he attempted to purchase a vehicle. Defendants Foulke and Triad moved to dismiss this action and to compel arbitration arguing, _inter_ _alia_, that Plaintiff was bound by a written arbitration agreement to submit his claims against

4

Foulke and Triad to a binding arbitration process.

On April 6, 2009, this Court addressed the Foulke and Triad motion to dismiss and compel arbitration, declined to address Defendants' motion to dismiss on the merits, and reserved decision as to whether arbitration could be compelled in this case, pending discovery regarding Plaintiff's financial resources and the expected costs of the arbitration. Adamson v. Foulke Mgmt. Corp., No. 08-4819, 2009 WL 961378 (D.N.J. Apr. 6, 2009). The Court found that "there exists a valid contract to arbitrate Plaintiff's claims in this action against Defendants Foulke and Triad," and further that the procedural aspects of the contract between the parties did not render the contract unenforceable. Id. at *7-8. Nevertheless, the Court concluded that it could not rule on Plaintiff's substantive challenge to the enforceability of the arbitration agreement, in which he argued that the contract was prohibitively expensive and unconscionable because he would be forced to pay arbitration fees as well as the costs of an ASL interpreter, without a more developed record. Id. at *9. The Court gave Plaintiff and Defendants Foulke and Triad the opportunity to engage in limited discovery regarding Plaintiff's financial condition and the costs of arbitration and ordered additional motion practice on the subject. Id.

In response to this Court's April 6th Opinion and Order, Plaintiff and Foulke and Triad have engaged in discovery and

5

Plaintiff has moved the Court to find the arbitration agreement unconscionable because it is prohibitively expensive, requires Plaintiff to pay for an ASL interpreter and because he may be required to pay for Defendants' costs in moving to dismiss this action.  Defendants respond that Plaintiff has failed to meet his burden of showing that arbitration would be prohibitively expensive, adding that Defendants will pay all costs of arbitration (whatever they may be), and that any unconscionable provision should be severed so that arbitration must proceed.

In light of Defendants' challenge to Plaintiff's credibility, the Court held an evidentiary hearing on November 10, 2009.  Plaintiff presented the testimony of Iris Boshes, Executive Director of the Deaf-Hearing Communication Centre, Inc. in Swarthmore, Pennsylvania, regarding the costs of ASL interpreters.  Plaintiff then testified regarding his assets, income, and expenses.  Defendants presented the testimony of William Kopp, General Manager of Foulke Management.  On November 19, 2009, the Court heard oral argument from Plaintiff and Defendants, at which point it became apparent that Plaintiff's financial situation was still very much in dispute.  The Court reopened the record and gave Plaintiff an opportunity to provide copies of all of his bank statements beginning in November 2008 to the present (along with an affidavit certifying to the completeness and accuracy of the records) and allowed Defendants

an opportunity to respond in writing to these documents, as set forth in this Court's Order filed November 19, 2009.  The Court finally closed the record on December 4, 2009.  This opinion follows.

**B.   The Arbitration Agreement**

This dispute focuses on several provisions of the arbitration agreement that Defendants seek to enforce.  The agreement has this to say about costs: "COST OF ARBITRATION: If you start arbitration, you agree to pay the initial filing fee and required deposit required by the American Arbitration Association ["AAA"].  If we start arbitration, we will pay the filing fee and required deposit."  (Arbitration Agreement, P-4.)  Also relevant, is this provision in the agreement: "ARBITRATION RULES: Arbitration will be conducted under the 'Commercial Arbitration Rules' of the [AAA] that are in effect at the time arbitration is started and under the rules set forth in this agreement.  If there is any conflict between what the Commercial Arbitration Rules say and what this agreement says, what this agreement says will govern."  (Id.)  As a consequence, both Plaintiff and Defendants cited to the AAA rules in speculating as to the necessary costs for arbitration.

In addition, the agreement addresses costs of any motion to dismiss under the heading "STARTING ARBITRATION," stating that if either party refuses to dismiss a suit on a demand for

arbitration, that party must pay the costs and attorney's fees of the party seeking to compel arbitration.

As previously noted, during a telephonic conference, Plaintiff also challenged the choice of law provision of the agreement which states:

> The arbitrator shall render his/her decision only in conformance with New Jersey law and evidence rules.  If the arbitrator fails to render a decision in conformance with New Jersey law or evidence, then the award may be reversed by a court of competent jurisdiction for mere errors of New Jersey law.  A mere error is the failure to follow New Jersey law.

(Id.)

Finally, the arbitration agreement has a provision for severance: "If any term of this agreement is unenforceable, the remaining terms of this agreement are severable and enforceable to the fullest extent of the law."  (Id.)

### C.   Evidence of Plaintiff's Financial Situation and the Costs of Arbitration

Both parties have submitted evidence regarding Plaintiff's financial situation and the costs of arbitration in this case. Defendants' evidence is focused on Plaintiff's credibility and the applicability of the Consumer Rules of the American Arbitration Association ("AAA").  Plaintiff offers his own testimony and various documents, including tax returns and his bank statements, along with the testimony of Ms. Boshes.

1.   <u>Plaintiff's Financial Situation</u>

Plaintiff, who is a college graduate experienced in accounting, submitted two affidavits, along with his own testimony, regarding his financial situation.  In his initial affidavit, dated May 13, 2009, Plaintiff swore that he is married with four children between the ages of two months and nine years. (Adamson Aff. 1, P-2 ¶ 5.)  He and his entire family, including all four children, have been bilaterally deaf since birth.  (<u>Id.</u>) Plaintiff states that has been unemployed since March 26, 2008, when he was laid-off from his job as an accountant.  (<u>Id.</u> ¶ 8.) His wife similarly does not work.  (<u>Id.</u> ¶ 7.)  Plaintiff stated that his only source of income was his Social Security Disability payments of approximately $1,300 per month, as his Pennsylvania Unemployment Compensation of $2,120 per month expired in April 2009.  (<u>Id.</u> ¶¶ 10-11.)  At the time of his signing, Plaintiff had a joint checking and savings account with a balance of less than $500 and a college savings plan for the children with approximately $2,466.  (<u>Id.</u> ¶¶ 14-15.)  He owned a home in Philadelphia, Pennsylvania, on which he made mortgage payments. (<u>Id.</u> ¶ 12.)  Attached to this first affidavit is a chart prepared by Plaintiff that includes his representations of his income and expenses, with many expenses (Geico, AT&T, PECO Electric) shown as being the same each month.  (Pl. Exh. 2.)

Plaintiff's supplemental affidavit, prepared in response to

Defendants' various challenges to Plaintiff's credibility (noting, for example, that Plaintiff's tax returns state he is single and observing that Plaintiff had failed to present any documents to support his asserted expenses), states that he described himself as "single" on his tax returns "because no other member of [his] immediate family receives any earned income." (Adamson Aff. 2, P-3 ¶ 5.) Plaintiff states that he confirmed this practice both with the Internal Revenue Service ("IRS") and H&R Block. (Id. ¶¶ 5-7.)[4] Plaintiff also submitted what he described as PDF documents supplied by Geico, AT&T, Philadelphia Gas Works ("PGW"), Philadelphia Water Revenue Bureau, and Countrywide, in response to his request for records of what he paid in bills. (Id. ¶¶ 8-9.) Almost all of those documents are dated after the emails to which they were allegedly attached (for example, the email from PECO is dated May 4, 2009, and the attachment supposedly provided by PECO is dated May 11, 2009) and appear to use the same font and the same format for the various companies. (Id., Attachment B.) Each document indicates that Plaintiff paid an identical amount each month for each of his utilities and all documents and emails are signed by various

---

[4] Plaintiff's understanding is incorrect as a matter of law. A married taxpayer has two options in filing his Form 1040 -- he can file as "married filing jointly" with his spouse, or "married filing separately." It is not credible that anyone from the IRS or from a tax preparation service could have rendered different advice.

departments and agencies, not individuals.  (Id.)

At the evidentiary hearing, Plaintiff confirmed that he is the deaf father of four deaf children and husband to a deaf wife who has been unemployed since March 2008.  Plaintiff testified that his only source of income is $1,300 in Social Security Disability benefits and that his wife and children also receive Social Security benefits, so that their income helps cover excess expenses.  Plaintiff says his entire disability benefits go toward living expenses.  Plaintiff testified that, on August 31, 2009, he moved his family to Maryland because the schools were better.  Plaintiff sold his house, but states that he did not make a profit on the sale, and now rents a home in Frederick, Maryland for $1,400 per month.  He testified that his grandmother gave them $3,500 to cover the rent deposit on the new home. Plaintiff listed his assets as a 1994 Buick LeSaber and approximately $126 in his checking account.  He listed his expenses as electricity (approximately $65 per month), water (approximately $136 quarterly), gas, rent ($1,400 per month), and cable (approximately $135 per month).

On cross-examination Plaintiff conceded that he was now paying more in rent than he had been paying in mortgage payments, but that he was able to get by (as described above), because it was important for his children to go to school in Maryland.  He asserted that he had access to bank statements, but that he had

not provided them because he was not asked for them.  Plaintiff could not explain why the PDF documents he stated were from his various utility companies were dated later than the emails to which he said they were attached.  He was not asked why the PDF documents from the various companies were so similar in format and font.

Finally, with the Court's permission, and as required by this Court's Order filed November 19, 2009, Plaintiff submitted bank statements for an account with the General Electric Employees Federal Credit Union ("GEEFCU"), held jointly with his wife, from November 2008 until November 2009.  (P-22.)  Plaintiff did not certify that these were his complete bank statements and in his affidavit references payments by his Pay Pal and Visa credit card accounts that are not shown in his GEEFCU account.  (Pl. Decl. ¶ 5, P-22.)  The statements also show transfers to and from "Share 0000," "Share 0001," and "Share 0060."  (P-22.)  The statements do not confirm the amount of expenses Plaintiff claims to have paid (Plaintiff says this is because those expenses were paid through Pay Pal and Visa).  (Pl. Decl. ¶ 5, P-22.)  Nor do the statements reflect the unemployment Plaintiff claims to have received until April 2009, though they do reflect Social Security payments.  (P-22.)

Defendants' evidence regarding Plaintiff's financial situation goes largely to his credibility.  They offer records

from the various utilities that are all inconsistent with what
Plaintiff claims to have been paying for their services.  (D1-
D5.)  For example, both PECO and the Water Revenue Board records
show payments that vary widely month-to-month and exceed the
uniform amounts Plaintiff claims to have been paying.  (D-3, D-
5.)  Geico, meanwhile, has no records associated with the account
number that Plaintiff provided Defendants.  (D-4.)  Defendants
argue that Plaintiff failed to supply "copies of all his bank
statements" as required by the Court's Order, November 19, 2009,
because it is clear that he maintains one or more other accounts
that have not been produced, and that he has redacted account
activity in the submitted records without explanation, apparently
including information reflecting sources of income for himself,
his wife, or his children.

### 2.   Costs of Arbitration

Though both parties have offered evidence regarding the
costs of arbitration, most of the dispute revolves around whether
the AAA Commercial Rules fees or the Consumer Rules fees will
apply.  Both parties offer the affidavit of Gerald Strathmann,
Vice President of the AAA since January 2008.  (Strathmann Aff.,
P-21.)  Mr. Strathmann offered no opinion as to which rules would
apply, but outlined what the costs would be under both.  Under
the Consumer Rules, if a consumer's "actual damages claim or
counterclaim, exclusive of punitive damages and attorney's fees,

13

does not exceed $10,000," then the consumer will pay no more than
$125 towards the arbitrator's fees and no administrative fee.
(Id. ¶ 11.)  If the actual damages exceed $10,000 but are less
than $75,000, then the consumer pays no more than $375 towards
the arbitrator and no fee.  (Id. ¶ 12.)  If actual damages are
greater than $75,000, "or if the consumer's claim seeks solely
non-monetary relief or an undetermined amount of damages," the
Commercial Rules fees are applied and the arbitrator is
compensated at his or her professional rate, with the costs is
split evenly between the two parties.  (Id. ¶ 13.)

Under the Commercial Rules, if the claim "is solely non-
monetary," the claimant must pay an initial filing fee of $3,250
and a case service fee of $1,250.  (Id. ¶ 15.)  If the claim is
for undetermined monetary damages, the claimant must pay a filing
fee of $10,000, though the amount may decrease if the claimant
discloses the amount prior to the hearing.  (Id. ¶ 15.)  If the
disclosed amount is less than $75,000, and if the Consumer Rules
apply, then the Consumer fees will apply and the money will be
refunded to the claimant.  (Id.)  Under Rule R-49 of the
Commercial Rules, though the claimant must advance the filing
fee, the arbitrator can reapportion the cost and the AAA "may, in
the event of extreme hardship on the part of any party, defer or
reduce the administrative fee."  (Id. ¶ 17.)  Other costs include
all travel, other expenses of the arbitrator, and the costs of a

14

AAA hearing room if the parties request one ($150 per day), which are divided equally between the parties, and the costs of any interpreter are to be borne by the party seeking such a service. (<u>Id.</u> ¶¶ 16, 19).  Finally, Mr. Strathmann reported that the average daily rate for an AAA Commercial Panel arbitrator in New Jersey is $1,684.16, and the costs range from $600 to $35,000. (<u>Id.</u> ¶ 19.)

Turning to the AAA Rules themselves, Rule R-1 of the Commercial Rules state:

> The AAA applies the Supplementary Procedures for Consumer-Related Disputes  to arbitration clauses in agreements between individual consumers and businesses where the business has a standardized, systematic application of arbitration clauses with customers and where the terms and conditions of the purchase of standardized, consumable goods or services are nonnegotiable or primarily non-negotiable in most or all of its terms, conditions, features, or choices. The product or service must be for personal or household use. The AAA will have the discretion to apply or not to apply the Supplementary Procedures and the parties will be able to bring any disputes concerning the application or non-application to the attention of the arbitrator.

(P-21, Attach. B.)  The Consumer Rules Rule C-1 similarly state, "The Commercial Dispute Resolution Procedures and these Supplementary Procedures for Consumer-Related Disputes shall apply whenever the American Arbitration Association (AAA) or its rules are used in an agreement between a consumer and a business" where the above requirements (standardized application of non-negotiable arbitration clauses and purchase of household product

15

or service) are met. (P-21, Attach. A.)

Plaintiff also offered the testimony of Iris Boshes, Executive Director of the Deaf-Hearing Communication Centre, Inc. ("DHCC") in Swarthmore, Pennsylvania, who stated that DHCC and all ASL interpreter services in the Delaware Valley of which she is aware will provide no less than two ASL interpreters for any legal proceeding (they will not allow only one interpreter).  The legal rate for each interpreter is $146 for up to two hours and then $73 per hour after than, plus travel expenses.

Defendants offered the testimony of William Knopp, General Manager of Foulke Management, who stated that he has been involved with approximately ten AAA arbitration cases, and that none had lasted more than one day (even with six witnesses), most lasted two to four hours, and none cost Foulke more than $1,600. For all of these arbitration cases, the AAA Consumer Rules fees were applied.  He conceded that none of his ten arbitration cases involved a deaf consumer or an ASL interpreter.

## II. DISCUSSION

To resolve both motions before it, this Court must determine whether part or all of this valid arbitration agreement is enforceable.  Though the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, sought to remove arbitration from disfavored status by insisting that arbitration agreements be placed on the same footing as other contracts, they remain limited by state contract

law, and in particular, the doctrine of unconscionability.  Homa
v. Am. Express Co., 558 F.3d 225, 228-30 (3d Cir. 2009) (citing
Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 686-87
(1996)); Muhammad v. County Bank of Rehoboth Beach, 912 A.2d 88,
94 (N.J. 2006).

### A. Whether the Costs of Arbitration Make Some or All of the Arbitration Agreement Unenforceable as Applied to Plaintiff

As discussed briefly in this Court's previous opinion, the
Third Circuit jurisprudence regarding the costs of arbitration
originates from the Supreme Court's opinion in Green Fin. Corp v.
Randolph, 531 U.S. 79 (2000), in which the Court held that while
costs of arbitration might be so high as to prevent a party "from
effectively vindicating her federal statutory rights in the
arbitral forum," the mere absence of a provision governing costs
in an arbitration agreement is not sufficient to make the
agreement unenforceable.  A party seeking to "invalidate an
arbitration agreement on the ground that arbitration would be
prohibitively expensive . . . bears the burden of showing the
likelihood of incurring such costs."  Id. at 92.

The Third Circuit has consistently held that to meet this
burden, a plaintiff must (1) come forward with some evidence to
show the projected fees that would apply to their specific
arbitrations, and (2) show the party's inability to pay those
costs.  Parilla v. IAP Worldwide Serv., 368 F.3d 269, 283-85 (3d

Cir. 2004) (applied to cost-shifting provision under Virgin Islands doctrine of unconscionability); Alexander v. Anthony Int'l, LP, 341 F.3d 256, 268-69 (3d Cir. 2003) (applied to cost-shifting provision under Virgin Islands doctrine of unconscionability); Spinetti v. Serv. Corp. Int'l, 324 F.3d 212, 216-17 (3d Cir. 2003) (applied to cost-splitting without reference to state law); Blair v. Scott Specialty Gases, 283 F.3d 595, 608-09 (3d Cir. 2002) (applied to cost-splitting provision without reference to state law).  In Blair, the Third Circuit further clarified that the mere existence of a cost-splitting provision, along with an unsupported and conclusory affidavit from the plaintiff regarding her limited financial resources, was insufficient to meet the showing required by Green Tree.  283 F.3d at 610.  Thus, a party seeking to declare arbitration costs to be unenforceable must offer some credible and substantiated evidence of that party's financial situation as well as the specific costs of arbitration.  See id.

The most recent relevant decision on this issue comes from the New Jersey Supreme Court in Delta Funding Corp. v. Harris, 912 A.2d 104 (N.J. 2006), in which the New Jersey court addressed this question certified by the Third Circuit:

> Is the arbitration agreement at issue in this case, or any provision thereof, unconscionable under New Jersey law, N.J. Stat. Ann. § 12A:2-302, and if so, should such provision or provisions be severed?

Delta Funding Corp. v. Harris, 426 F.3d 671, 675 (3d Cir. 2005).

18

The New Jersey Supreme Court held that a provision of a consumer contract of adhesion if interpreted by the arbitrator to permit the shifting of all arbitration costs to the consumer would be unconscionable and unenforceable because it "could chill Harris and similarly situated consumers from pursuing their statutory claims through mandatory arbitration." Delta Funding, 912 A.2d at 112-13, 114-15.  It appears that no evidence was presented or considered regarding Harris' actual ability to pay any costs. Thus, the New Jersey Supreme Court has created a per se rule of unconscionability for cost-shifting provisions in consumer arbitration agreements of adhesion.

      1.   Whether the Court May Consider Defendants' Offer to Pay All Costs of Arbitration

Defendants' first response to Plaintiff's motion is to offer to pay all costs of arbitration, whatever they may be.  Plaintiff replies that the Court may not look to this "after-the-fact" offer when determining whether the arbitration agreement is enforceable.  As will be explained below, the Court is compelled by the case law in this circuit and the New Jersey Supreme Court to ignore Defendants' offer to pay the costs in dispute here.

Though there has been some confusion as to whether the Court may look to a defendant's offer to pay costs in determining whether a particular cost provision is unconscionable and unenforceable, due in large part to what appears to be a stray comment by the Third Circuit, it is now clear that the Court may

19

not consider an offer to pay costs in making this determination.
In Delta Funding, the New Jersey Supreme Court rejected Delta's
argument that the cost provisions need not be scrutinized because
the defendant would pay all costs, quoting at length from the
Sixth Circuit's opinion in Morrison v. Circuit City Stores, Inc.,
317 F.3d 646 (6th Cir. 2003) (which found a cost-splitting
provision unenforceable):

> In considering the ability of plaintiffs to pay
> arbitration costs under an arbitration agreement,
> reviewing courts should not consider after-the-fact
> offers by employers to pay the plaintiff's share of
> the arbitration costs where the agreement itself
> provides that the plaintiff is liable, at least
> potentially, for arbitration fees and costs.  The
> reason for this rule should be obvious.  Our
> concern is that cost-splitting provisions will
> deter potential litigants from bringing their
> statutory claims in the arbitral forum.  When the
> cost-splitting provision is in the arbitration
> agreement, potential litigants who read the
> arbitration agreement will discover that they will
> be liable, potentially, for fees if they bring
> their claim in the arbitral forum and thus may be
> deterred from doing so.  Because the employer
> drafted the arbitration agreement, the employer is
> saddled with the consequences of the provision as
> drafted. If the provision, as drafted, would deter
> potential litigants, then it is unenforceable,
> regardless of whether, in a particular case, the
> employer agrees to pay a particular litigant's
> share of the fees and costs to avoid such a
> holding.

Delta Funding, 912 A.2d at 113 n.5 (quoting Morrison, 317 F.3d at
676-77).

The Third Circuit in Parilla similarly rejected the
defendant's offer to correct an unconscionable "loser pays"

provision (among others) by waiving the provision.  The appeals court cited to the Restatement (Second) of Contracts and concluded that "we must determine unconscionability as of the time the contract was formed, and an after-the-fact offer to waive certain contract provisions can have no effect on our analysis."  368 F.3d at 285.  In support, the appeals court noted that it had addressed a "similar issue" in Spinetti and quoted at length from Morrison (the same quote above, used in Delta Funding).  In Spinetti, the appeals court noted in a footnote that the defendant had not appealed the district court's determination that the employee bound by an arbitration agreement could not pay the costs of arbitration under the cost-splitting provision.  324 F.3d at 217 n.2.  The Third Circuit nevertheless went on to reject as irrelevant the employer's offer to pay the costs, quoting the same passage from Morrison, and saying "[the employer's] offer to pay the costs of arbitration upon proof that compelling Spinetti to pay her costs would be prohibitively expensive is an after-the-fact offer and will be treated as such."  Id.

The one Third Circuit opinion to suggest that consideration of a defendant's offer to pay is appropriate when presented with a potentially unconscionable arbitration cost provision is Blair, decided before Spinetti (2003), Parilla (2004), and Delta Funding (2006).  After deciding that the plaintiff employee should be

21

provided with an opportunity to perform limited discovery regarding costs, and so remand was required, the appeals court added:

> [The employer] should also be given the opportunity to meet its burden to prove that arbitration will not be prohibitively expensive, or as has been suggested in other cases, offer to pay all of the arbitrator's fees.

Blair, 283 F.3d at 610.  Subsequent to both the Blair and Spinetti decisions, but before Parilla, the Third Circuit in Alexander noted the conflict between this off-hand remark in Blair and the footnote in Spinetti, stating:

> In Blair, this Court indicated that the other party should be given the opportunity to "offer to pay all of the arbitrator's fees." Blair, 283 F.3d at 610.  However, we apparently rejected such "after-the-fact" offers as irrelevant to the cost inquiry in Spinetti. Spinetti, 324 F.3d at 217 n. 2 (quoting Morrison, 317 F.3d at 660).  We express no opinion at this time as to the appropriate role of these offers.

Alexander, 341 F.3d at 269 n.10.  Parilla, by citing Spinetti with approval, rejecting defendant's offer to waive the cost provision, and emphasizing that a court must determine unconscionability as of the time a contract was formed, appears to have resolved the matter.[5]  The Court cannot consider a

---

[5] Nor is it possible to distinguish Parilla and Delta Funding on the ground that they are cost-shifting, rather than cost splitting cases.  Morrison, on which both heavily rely, was a cost-splitting case, as was Spinetti.  Moreover, Parilla declined to distinguish between cost-shifting and cost-splitting where defendant argued that the cost-splitting provisions in Blair would certainly impose costs on the plaintiff, while the

Defendants' after-the-fact offer to pay costs in determining whether an arbitration agreement is unconscionable.

      2.   <u>Whether Plaintiff Has Met His Burden of Showing that the Costs of Arbitration Are Likely to Be Prohibitively Expensive</u>

Without considering Defendants' offer to pay all costs, and there being no New Jersey Supreme Court case directly on point, the Court must determine whether the costs of arbitration would be prohibitively expensive for Plaintiff under the law of this circuit and New Jersey.  The Court finds that Plaintiff has failed to provide reliable and complete evidence from which the Court can make this determination, despite numerous opportunities; consequently, the Court finds that Plaintiff has failed to meet his burden of establishing that the costs of arbitration would be prohibitively expensive.

The Court finds Plaintiff's testimony regarding his financial situation to be incredible and his supporting evidence to be unreliable.  Much of the Court's concern regarding Plaintiff's credibility, in fact, stems from his unreliable documentary evidence and his persistent failure to provide full documentation regarding his income and expenses even when given

_____

cost-shifting was only a probability.  <u>Parilla</u> applied the same analysis to the cost-shifting provision and similarly required the same individualized showing by the plaintiff (the particular costs and her inability to pay).  368 F.3d at 284.  Thus, at least in the Third Circuit, there doesn't appear to be a meaningful distinction between the two types of provisions.

multiple opportunities to do so.  While the Court can easily
imagine a case where a party's testimony alone, or even a
detailed affidavit, would be sufficient to make the necessary
showing of financial difficulty, this is not such a case.

Plaintiff's initial affidavit was entirely unsupported by
any objective evidence and when challenged by Defendants to
produce some supporting documentation Plaintiff submitted
documents[6] that the Court finds to be false.  As discussed above,
these documents are entirely inconsistent with the records
Defendants were able to subpoena from PECO and the Water Bureau
and include multiple suspicious traits.  They are all in the same
format and appear to be in the same font (though some contain
slightly larger point and one is in bold); they all indicate
identical amounts paid each month; they all come from various
departments rather than individuals; and finally the PECO,
Countrywide, PGW, GEICO, and Comcast "attachments" are all dated
<u>after</u> the alleged emails from those companies to which they were
allegedly attached.[7]

---

[6] These documents appear in Exhibit B to Aff. of John J.
Adamson Jr. (dated June 29, 2009), which were submitted at the
hearing before this Court on November 10, 2009, as part of Ex. P-
3.

[7] Further, Plaintiff's fabricated PECO documents were
contradicted by the actual billing statements that Defendants
were able to procure by subpoena from PECO (Ex. D-5).  The
certified PECO account statements show figures for billings and
payments that varied every month.

At the close of the hearing, in an effort to clear up this confusion, Plaintiff was given an opportunity to corroborate these expenses through his bank statements, and instead those statements show no such regular expenses, which Plaintiff explains only by referencing accounts (Pay Pal and Visa) for which he does not provide records.  Plaintiff's decision to submit false documents to the federal court is sufficient, on its own, to render all of his testimony incredible.  See Lambert v. Blackwell, 387 F.3d 210, 256 (3d Cir. 2004) (recognizing the doctrine of "falsus in uno, falsus in omnibus," meaning once the fact-finding finds a witness' testimony to be incredible on one material point, the fact-finder may conclude that all of his testimony is incredible).  Certainly, this false evidence, which was intended to corroborate Plaintiff's testimony regarding his expenses, has the opposite effect -- it renders that testimony unreliable.

Yet the Court finds other grounds to reject Plaintiff's testimony, and further to conclude that it lacks reliable evidence of Plaintiff's true income and expenses.  The Court has provided Plaintiff, a trained accountant, numerous opportunities to establish that arbitration would be prohibitively expensive for him.  The Court permitted Plaintiff to engage in limited discovery even after he first raised the problem of costs only in his sur-reply to Defendants' motion to dismiss and compel

arbitration.  Plaintiff had the opportunity to supplement his almost entirely unsubstantiated affidavit in support of his motion to find the arbitration agreement unconscionable and chose to submit the above-mentioned false documents.  The Court held an evidentiary hearing on November 10, 2009, when it became clear that Plaintiff's credibility was in doubt and permitted Plaintiff to testify and offer testimony of any other witnesses to support his arguments, subject to cross-examination.  Finally, even after the record was closed and discovery had long-since been completed, the Court reopened the record and permitted Plaintiff to offer additional evidence to support his claims that he cannot afford arbitration (rather than simply finding that Plaintiff had failed to meet his burden).  Specifically, the Court ordered Plaintiff to submit "all of his bank statements" along with a certification of their completeness [Docket Item 63].  Plaintiff did not do that.  Plaintiff provided statements from a single account, GEEFCU, which includes references to other accounts (Share 0000, Share 0001, and Share 0060) and does not include any of Plaintiff's income from unemployment payments, from which the Court concludes that other accounts exist and those statements have not been provided.  This failure to comply with the Court's November 19, 2009 Order and failure to disclose financial resources further confirms the Court's conclusion that Plaintiff's testimony regarding his income and expenses is not

credible and his evidence is not reliable.[8]

Without reliable evidence regarding either Plaintiff's income or his expenses, Plaintiff has failed to make the necessary showing regarding his ability to pay the costs of arbitration.  Plaintiff cannot meet his burden of establishing prohibitive costs without credible evidence regarding his financial circumstances.  See Maggio v. Zeitz, 333 U.S. 56, 75-76 (1948) (civil contemnor cannot meet burden of showing inability to comply with court order if his evidence is incredible); U.S. v. $87,375 in U.S. Currency, 727 F. Supp. 155, 162 (D.N.J. 1989) (claimants' incredible testimony  regarding the defendant currency failed to meet their burden of proof regarding the source of that currency).  As a consequence, the Court need not determine what the likely costs would be, for without sufficient evidence of Plaintiff's financial situation the Court cannot determine whether any particular costs would be prohibitively expensive for Plaintiff.  See Parilla, 368 F.3d at 283-85; Alexander, 341 F.3d at 268-69; Spinetti, 324 F.3d at 216-17; Blair, 283 F.3d at 608-09.  Nevertheless, the Court will briefly observe that the costs of arbitration are not likely to be as

---

[8] In addition, Plaintiff's explanation for filing federal tax returns as a single individual rather than as a married person is incredible.  His blaming the IRS and H&R Block for such advice is also incredible.  He is a college graduate trained in accounting who knew better, and no one in the IRS or in a tax preparation service would plausibly give such faulty information to a married taxpayer.

exorbitant as Plaintiff claims.

The Court agrees with Defendants that the Consumer Rules almost certainly would apply to this case, despite some discretion remaining to the arbitrator.  The Commercial Rules clearly incorporate the Consumer Rules as a supplement under Commercial Rules R-1.[9]  The Consumer Rules "shall apply whenever the [AAA] or its rules are used" in an arbitration agreement that (1) is between a consumer and a business, (2) where the business "has a standardized, systematic application of arbitration clauses with customers," (3) where "the terms and conditions of the purchase of standardized, consumable goods or services are non-negotiable or primarily non-negotiable," and (4) where the product or service is for "personal or household use."  (Consumer Rules C-1(a), P-21, Attach. A.)  There is no dispute that all the above factors apply to the arbitration and underlying transaction to purchase a car, see Rockel v. Cherry Hill Dodge, 847 A.2d 621 (N.J. Super. Ct. App. Div. 2004) (claim involving present Defendants seeking to enforce similar non-negotiable arbitration agreements), and the Court must assume that the AAA arbitrators

---

[9] In the Court's April 6, 2009 Opinion, the Court found that based on the plain language of the arbitration agreement, the Commercial Rules would be applied to this case.  Adamson, 2009 WL 961378, at *9.  The Court's opinion has not changed, but Defendants have since clarified (and the Court is convinced), that the Consumer Rules are not a separate set of AAA rules, but are instead a part of, and a supplement to, the Commercial Rules. Thus the arbitration agreement's reference to the Commercial Rules does not prevent the application of the Consumer fees.

will apply the rules as stated.

While it is true that in some circumstances, even a Consumer Rules-eligible case will use the Commercial fees, the Court finds it unlikely that such costs will ultimately be imposed here.  As outlined in Consumer Rule C-8, the fees are determined based only on the "actual damages and not any additional damages, such as attorneys' fees or punitive damages."  (P-21, Attachment A.) Plaintiff seeks $388.80 in actual damages for fees paid during his transaction with Defendants and "all sums relating to the fair market value of and damage to" Plaintiff's 1994 Buick LeSaber.  (Pl. Initial Disclosures at 4.)  Ordinarily, a 15-year old Buick may be worth a few thousand dollars at most.  He also asks for damages for his "pain, humiliation and emotional distress in an unliquidated amount to be determined at time of trial."  (Id. at 4, 5, 6, 7.)  Only if those actual damages ultimately amount to more than $75,000, or if Plaintiff were seeking "solely non-monetary relief," would the higher Commercial fees apply.  (Strathmann Aff., P-21 ¶¶ 13, 15.)  With such low monetizable damages, the Court finds it unlikely that Plaintiff's pain and suffering, even taking as true Plaintiff's allegations which describe an humiliating attempt to purchase a vehicle, will bring Plaintiff's actual damages over $75,000 (excluding any punitive damages and attorney's fees).  Thus, the likely costs for arbitration would at most be $375 plus the costs of two ASL

interpreters, which the Court will estimate to be approximately
$2,336 (the cost of two interpreters for two eight-hour days),
not including transportation costs, for a total of approximately
$3,000 (assuming the hearing lasts two days).[10]

Nevertheless, as stated above, even if the costs are likely
to be much higher, the Court cannot determine whether they are
impermissibly high for Plaintiff because the Court does not have
reliable information about his income or expenses.  The Court
consequently finds that the costs of arbitration, as applied to
Plaintiff, do not render the arbitration agreement unenforceable
on account of Plaintiff's inability to pay costs.

**B.    Remaining Challenges to the Arbitration Agreement**

At various points during the litigation of this case,
Plaintiff has attacked other aspects of the arbitration
agreement.  The Court will address each briefly.

**1.   Choice of Law Provision**

During an off-the-record telephone conference for the
purpose of scheduling the November 10 hearing on financial
hardship, Plaintiff raised another attack on the arbitration
agreement, this time focusing on its choice of law provision,

---

[10] The two-day estimate is more than the length of the
lengthiest arbitration involving vehicle purchases at Defendants'
dealership, according to Mr. Kopp's testimony, which the Court
credits.  The extra time estimate is warranted due to the
necessity of interpreters and the wider range of claims brought
by Mr. Adamson compared with the usual consumer complaint.

which reads:

> The arbitrator shall render his/her decision only
> in conformance with New Jersey law and evidence
> rules.   If the arbitrator fails to render a
> decision in conformance with New Jersey law or
> evidence, then the award may be reversed by a court
> of competent jurisdiction for mere errors of New
> Jersey law.  A mere error is the failure to follow
> New Jersey law.

(Arbitration Agreement, P-4.)  Plaintiff reads this provision to

mean that the arbitrator cannot consider Plaintiff's federal

claims.  The Court disagrees, for it is plain from the

arbitration agreement that Plaintiff retains his federal

statutory claims.  First, the arbitration agreement expressly

encompasses arbitration of "any claim or dispute based on a

federal or state statue."  (Id.)  Second, an arbitrator can apply

New Jersey law and still consider federal claims.  Plaintiff was

free to bring his claims in the New Jersey courts and the New

Jersey courts would have properly applied federal law in

interpreting those claims.  See Brown v. State, 811 A.2d 501, 510

(N.J. Super. Ct. App. Div. 2002) (denying ADA claim by looking to

state and federal case law); National Community Bank of New

Jersey v. G.L.T. Industries, Inc., 647 A.2d 157, 158 (N.J. Super.

Ct. App. Div. 1994) (finding that defendants had no defense under

the Equal Credit Opportunity Act).  Thus, it would be contrary to

New Jersey law (not in conformance with) to fail to consider

Plaintiff's federal statutory claims under the appropriate

governing law.  This provision stands.

31

2.  <u>Costs of Motion to Dismiss</u>

In his moving papers, but nowhere else, Plaintiff attacks the provision of the arbitration agreement that calls upon any party refusing to dismiss a lawsuit must pay the costs for the party demanding arbitration.  Defendants have not yet sought to enforce that provision and the Court finds it premature to address this matter at this stage.

3.  <u>Facial Challenges Address the Requirement that Plaintiff Pay for His Own ASL Interpreter: AAA As A Biased Forum and the Unknowing Waiver of the Right to a Reasonable Accommodation</u>

Plaintiff's two remaining challenges to the arbitration agreement involve the AAA's apparent requirement that any party seeking the services of an interpreter pay for those services. Though not adequately raised in any of the briefing and though the AAA is not a party to this action, Plaintiff argued for the first time at the evidentiary hearing held on November 10, 2009[11] that arbitration is unconscionable as applied to a deaf person because the AAA itself provides a biased forum.  According to Plaintiff, AAA will necessarily provide a biased forum for Plaintiff's Americans with Disabilities Act ("ADA") claim because the AAA itself is operating in violation of the ADA by failing to

_____

[11] As previously noted, the briefing only includes Plaintiff's oblique reference to such a claim, noting the "irony" or requiring Plaintiff to arbitrate in a forum where he allegedly will be required to pay for the costs of his own interpreter. (Pl. Opening Brief at 9.)

provide ASL interpreters to deaf claimants.  In addition, at page eight of Plaintiff's nine-page memorandum in support of his motion to find the arbitration agreement unconscionable, Plaintiff asserts that the application of the AAA rules constitutes an undisclosed waiver of his right to a reasonable accommodation and effective communication in future legal proceedings.  No citation to case law or statutory authority is offered.  Plaintiff bases this argument on Consumer Rule R-27, under the heading "Interpreters," which states: "Any party wishing an interpreter shall make all arrangements directly with the interpreter and shall assume the costs of service."  (Pl. Exh. 21, Attach. B.)  Plaintiff does not support either argument with case law and neither is addressed in more than a few sentences.

The Court will not consider these claims at this time for several reasons.  First, Plaintiff has failed to adequately raise either issue and has consequently deprived Defendants of the opportunity to respond to such claims.  This may also be due, in part, to the fact that when the Court originally granted Plaintiff leave to pursue limited discovery and file a motion asking the Court to declare the arbitration agreement unenforceable, the only issue to be raised was the question of prohibitively expensive arbitration costs [Docket Item 36].

Thus, Plaintiff's fleeting references to other objectionable

aspects of the costs of arbitration were, at most, afterthoughts not further developed by briefing in this case, which was instead focused on the issue of financial hardship.  Second, Plaintiff has yet to request, and the AAA has yet to deny, a reasonable accommodation.  While the Court assumed for the purposes of calculating likely arbitration costs that Plaintiff will be required to pay for his own ASL interpreters, the Court will not find that the AAA has violated the ADA where Plaintiff has yet to make such a request and the AAA has yet to deny it (assuming that the AAA is a place of "public accommodation" under the ADA, 42 U.S.C. § 12182).  Third, the AAA is not a party to this action. Consequently, the question of AAA's compliance with the ADA is not presently before the Court.  Fourth, Iris Boshes testified that if her agency provided the ASL interpreters for the arbitration hearing, they "would not charge the deaf person," here, Mr. Adamson.  It may well be, if the case is heard in AAA arbitration, that Plaintiff will not even be billed by the Deaf-Hearing Communication Centre which Ms. Boshes directs.

Despite the perfunctory treatment of these issues in the briefing here, the Court recognizes that Plaintiff may be attempting to raise serious and potentially far-reaching concerns about the way in which disability is handled in the context of arbitration.  The Court is unwilling to address these issues without adequate briefing for any party, and without the

participation of the AAA, potentially a necessary party under
Rule 19(a)(1), Fed. R. Civ. P.  Moreover, it would be premature
to decide whether the AAA arbitration agreed to by the parties
would violate the ADA or the NJLAD for failure to provide free
interpreter services as an accommodation for Plaintiff's
disability.  It may come to pass that the ASL interpreters are
provided at no cost to Plaintiff, either as a gratuity offered by
the Deaf-Hearing Communication Centre (as Executive Director
Boshes indicated) or as a reasonable accommodation provided by
the AAA[12] or as a concession by the Defendants as part of their
offer to pay Plaintiff's costs and fees.[13]  If so, there would

_____

[12] The Court, as noted about, is not determining whether the
AAA has any obligation to provide ASL interpreters to enhance a
deaf consumer's access to the arbitral forum under federal or
state law.  The point is that it is possible that the AAA, if
requested to do so, would provide the ASL interpreters at no cost
to the deaf individual and there would be no controversy.

[13] As discussed above, the Third Circuit and the Supreme
Court of New Jersey have held that a trial court may not consider
a party's after-the-fact offer to pay the adverse party's costs
and fees of arbitration to cure a claim of financial hardship
under the doctrine of unconscionability.  See Parilla v. IAP
Worldwide Serv., 368 F.3d 269, 283-85 (3d Cir. 2004), and Delta
Funding Corp. v. Harris, 912 A.2d 104, 133 n.5 (N.J. 2006), and
Part II.A.1, supra.  These precedents did not address the
situation where a disabled person asserted that the arbitration
agreement is unenforceable because it is discriminatory as
applied to deaf persons.  When a disabled person raises the claim
of denial of access to the arbitral forum due to failure to
provide ASL interpreters, however, is it doubtful that the
precedents in Parilla, Delta Funding and similar cases would
apply to preclude the opponent from providing the interpreters at
no cost to the disabled consumer.  Under Plaintiff's claim
seeking to void the arbitration agreement based on discrimination
against him as a deaf person, it would logically follow that the

likely be no controversy for the Court to adjudicate.  The far better course, rather than addressing claims that are sketchy and premature, is to await future developments as these parties go to arbitration.  Plaintiff's meaningful and fair participation in arbitration by ASL interpreters at no charge, if it occurs, would require no further action by this court.  If the arbitration agreement violates Plaintiff's rights under applicable statutory law such as NJLAD or ADA, and if Plaintiff is dissatisfied with the arbitrator's award, such grounds may be raised as a basis to vacate the award due to violation of the law.

## III. CONCLUSION

For the foregoing reasons, the Court will deny Plaintiff's motion to declare the arbitration agreement unenforceable, having found that Plaintiff has failed to meet his burden of showing that the costs of arbitration would be prohibitively expensive for him.  The Court will further grant Defendants' motion to dismiss and compel arbitration.  The Court will not address

---

Defendant would have an obligation to provide certified interpreters at no cost to Plaintiff as a reasonable accommodation to level the playing field.  This would have nothing to do with Plaintiff's ability to pay and everything to do with accommodating Plaintiff's disability.  Moreover, where a deaf consumer needs the services of ASL interpreters in arbitration, public policy should welcome the gesture of the forum or the opponent in providing the interpreters whether or not they were required to do so by statute.  While the Court does not decide the issue, it is at least possible that Defendant's payment of interpreter fees would moot a claim of denial of access based upon disability and structural unfairness of the AAA forum.

Plaintiff's suggestions that the arbitration would discriminate against him on the basis of his deafness, because such claims are both undeveloped and unripe.  The Court will deny Plaintiff's request to deem Plaintiff's requests for admissions to be admitted.  The accompanying Order shall be entered.


**December 18, 2009**                    **s/ Jerome B. Simandle**
Date                                     JEROME B. SIMANDLE
                                         U.S. District Judge